## HUTCHINSON v. DICKIE.
### No. 10415.

Circuit Court of Appeals, Sixth Circuit.
June 5, 1947.

---

[1] See N. L. R. B. v. E. C. Aitkins & Co., 67 S.Ct. 1265, and N. L. R. B. v. Jones & Laughlin Steel Corp., 67 S.Ct. 1274.

Robert Branand, and G. R. Johnson, both of Cleveland, Ohio (Robert Branand, and Gilbert R. Johnson, both of Cleveland, Ohio, on the brief; Johnson, Branand & Jaeger, of Cleveland, Ohio, of counsel), for appellant.

Silas B. Axtell, of New York City (Victor M. Todia, and Harry A. Gordon, both of Cleveland, Ohio, on the brief; Silas B. Axtell, of New York City, of counsel), for appellee.

Before HICKS, MARTIN and MILLER, Circuit Judges.

HICKS, Circuit Judge.

Appeal from a decree in admiralty, dismissing appellant's petition for exoneration from or limitation of liability, awarding damages against him in the sum of $30,000.00 for the wrongful death of appellee's decedent, one James S. Dickie.

On September 20, 1943, appellant, Gene C. Hutchinson, the owner of the pleasure cabin cruiser "Cappy", invited James S. Dickie, Clinton Barry and Arlington Smith to go with him in the Cappy on a pleasure cruise on Lake Erie. During the cruise Dickie was drowned.

On August 9, 1944, appellant Hutchinson filed a petition for exoneration from or limitation of his liability as owner. See Title 46 U.S.C.A. § 183. On October 9, 1944, Mrs. Dickie, decedent's widow and the executrix of his estate, filed a claim against appellant for damages for Dickie's

death. The District Judge denied the claim for limitation of liability and under and by virtue of Hartford Accident Co. v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612, and Spencer Kellogg & Sons, Inc. v. Hicks, Adm'x., 285 U.S. 502, 512, 52 S.Ct. 450, 76 L.Ed. 903, rendered a decree in appellee's favor against appellant for damages in the sum of $30,000.00.

We think there was sufficient evidence to support the court's denial of appellant's claim for limitation of liability under the statute above cited and nothing more need be said upon that feature of the case. We pass to appellee's claim for damages.

Appellee's formal claim is that Dickie lost his life by drowning through the fault and negligence of appellant. The court rendered an oral opinion and filed Findings of Fact and Conclusions of Law. These findings are as follows:

"1. The petitioner, Gene C. Hutchinson, was, at all times material to the issues herein, sole owner and operator of the cruiser 'Cappy'.

"2. On September 20, 1943, petitioner met decedent at Allendorf's restaurant, in downtown Cleveland and invited him and two other men to join him on a cruise. They had a couple of drinks before lunch. From there they stopped at the Rudd Machine Company and picked up one Ed. Rhoda, who was employed part time by petitioner to relieve him at the wheel of the Cappy and handle the lines coming in and out of the harbor. They then proceeded to the Clifton Lagoons where the Cappy was docked. There was a delay of an hour and a half in getting started, during which time more drinks were consumed. About 4:30 P. M., the Cappy left the Lagoons, with petitioner at the controls, and proceeded to the Lakeside Yacht Club where they went inside and had more drinks, remaining there about 45 minutes to an hour.

"3. I find that all these places (except Rudd Machine Company) intoxicating liquor was consumed by petitioner, and his guests, including claimant's decedent, and that in all they undoubtedly had five or six of such drinks, all within a period of 4 to 5 hours.

"4. The Cappy left the Lakeside Yacht Club and proceeded out of the harbor entrance at Cleveland and into the open lake. There was a northeast wind and a sea running at the time, which gave the boat quite a roll. Decedent was sitting in the cockpit in the stern of the boat, and when the Cappy was out about half a mile, petitioner decided to head for the Clifton Lagoons. He turned west and shortly thereafter decedent disappeared over the Cappy's side.

"5. I find that when decedent went overboard, it was daylight; that he was seen by petitioner; that he was then only 75 feet away from the Cappy; that petitioner was negligent in failing to bring his cruiser about; and that he failed to make a reasonable effort to rescue decedent.

"6. I find that from the age of five years, petitioner has been required to wear a steel brace, weighing approximately 6 pounds, to support his body, due to an unfortunate physical affliction; that even when using said brace, petitioner experiences difficulty in getting about; that prior to the time decedent went overboard, petitioner had removed such brace, and that he was operating the controls of the Cappy without its support.

"7. I further find that petitioner was incapable of coordination on this particular occasion due to the excessive use of alcoholic stimulants coupled with his physical impairment.

"8. The only other seaman on board was Ed. Rhoda, an elderly man, who was hard of hearing, could not swim, and had no value as a member of the crew.

"9. I find that the cruiser Cappy was unseaworthy in that it was not fully manned on this particular voyage because of the inadequacy of petitioner and the said Rhoda to function as a competent crew.

"10. I further find that petitioner did not use due care in providing claimant's decedent with a seaworthy vessel on September 20, 1943.

"11. I further find that the petitioner had privity and knowledge of the unseaworthiness of the cruiser Cappy at the time claimant's decedent came to his death.

"12. I further find that claimant has sustained damages as a direct result of the negligence of the petitioner.

"13. I find that there was no contributory negligence on the part of claimant's decedent.

"Conclusions of Law

"1. I conclude that the petition for exoneration from or limitation of liability must be denied.

"2. I conclude that the petitioner must be held liable to the damage claimant for damages sustained by her, in the amount of Thirty Thousand Dollars ($30,000.00) and costs."

■ These findings were made in an effort to comply with Admiralty Rule 46½, 28 U.S.C.A. following section 723. The fact is, as stated in finding 4, "decedent disappeared over the Cappy's side." The court saw the witnesses and heard their testimony and this finding must prevail. Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992. But there is no evidence that he was caused to disappear from the cruiser by any act of negligence or misconduct of appellant who was steering the cruiser at the time, or by any misconduct or negligence of one Rhoda, the sole member of the crew, or by any defect in the construction of the cruiser. The gravamen of appellee's claim is that after Dickie had fallen into the lake appellant failed to use that degree of care required of him by law to effect his rescue.

A few words here with reference to the court's findings of fact: If by finding 5 the court meant that appellant saw Dickie as he went overboard, there is no evidence to support it. Further, the finding that "petitioner" (appellant) "was negligent in failing to bring his cruiser about and that he failed to make a reasonable effort to rescue the decedent" is neither a special finding of fact nor a separate conclusion of law, but an inter-mixed finding of both law and fact.

Likewise, finding 12, "that claimant has sustained damages as a direct result of the negligence of petitioner" is obviously not one of fact.

■ Both these findings may however be treated as conclusions of law which we should review. Negligence is to be determined upon consideration of what duty, if any, appellant owed to Dickie in an effort to rescue him.

■ We take no stock in appellant's contention that he was under no legal obligation to rescue decedent. Dickie was an invited guest upon appellant's cruiser. When appellant heard the cry "Man Overboard" (an undisputed and relevant fact not referred to either in the findings or in the court's opinion) we think it was his duty to use reasonable care to rescue him. This was certainly a moral duty, universally recognized and acted upon. Dickie was drowning and appellant's cruiser was the only instrumentality by which he might be rescued.

In Carey v. Davis, 190 Iowa 720, 180 N. W. 889, 891, 12 A.L.R. 904, an Iowa case, the court in quoting from Adams v. Chicago G. W. R. Co., 156 Iowa 31, 135 N.W. 21, 42 L.R.A.,N.S., 373, said: " * * * whenever one person is by circumstances placed in such a position with regard to another that everyone of ordinary sense * * * would at once recognize that, if he did not use ordinary care and skill in his conduct with regard to those circumstances, he would cause danger of injury to the person or property of the other, a duty arises * * * to avoid such danger."

In Bishop on Non-contract Law, Sec. 124, this view is clearly stated, to wit: "Whenever a thing has become universally recognized to be a social duty, especially when it has become thus elevated into a usage, if of a magnitude and importance sufficient to be within the law's cognizance, the doing of it is thereupon either legally required or legally permitted." To ask of appellant anything less than ordinary care under the circumstances is so shocking to humanitarian considerations and the commonly accepted code of social conduct that the courts in similar situations have had no difficulty in pronouncing it to be a legal obligation.

The court found that appellant's employee, Rhoda, was an elderly man (74), hard of hearing, could not swim, and had no value as a member of the crew; that appellant himself was incapable of co-ordination at the time of the accident, due to ex-

cessive use of alcoholic stimulants, coupled with his physical impairment; and that by reason of the disabilities of Rhoda and appellant, the cruiser was unseaworthy. But the court does not find either in the findings or in the record anything to indicate that the disabilities of appellant and Rhoda, or either of them, affected the rescue measures or contributed to Dickie's death.

No description of the cockpit is included in the findings and we do not describe it further than to say it was two feet six inches in depth and extended from the stern to the cabin from port to starboard sides. It was equipped with guard rails and stanchions and furnished with chairs for the convenience and pleasure of appellant's family, visitors and guests. The boat itself was standard type 38' cruiser, equipped with twin motors. When last seen in the cockpit Dickie was sitting quietly in one of the chairs and engaged in conversation with Smith, sitting in the cabin. There is in evidence a statement made by Smith to Mrs. Dickie in the presence of appellant, that he, Smith, saw Dickie go overboard, "that he sort of arose and his feet were bothering him." This fact was not referred to in the findings.

█ It was also shown that Dickie, 63 years of age and the Vice President of a shipbuilding concern, was an experienced seaman and a good swimmer, although he had defective vision in one eye and wore heavy glasses. Under these circumstances we think that appellant had a right to assume that Dickie would use ordinary care to protect himself and that it was not required of appellant to anticipate the necessity of having a life guard as a member of the crew. As a matter of law, appellant was not required to have a crew at all. He was not even required to have a license.

The court did not, either in the opinion or the findings, make reference to what we regard as relevant and undisputed facts. They are, that appellant, at the controls, saw Dickie sitting in the cockpit of the cruiser talking through the door to Smith, who was sitting in the cabin, about two or three minutes before he heard the cry "Man Overboard"; that when he heard the cry he immediately reversed the motors, looked back and within a matter of a few seconds he saw a person's head on the surface of the water. The court found that at that time, the decedent was only 75 feet away from the Cappy, and we are bound by that finding. The further fact is that appellant backed the Cappy full speed astern, and Rhoda, then in the cockpit, threw two life rings to Dickie. The first ring fell within twenty feet, and the second within six feet of Dickie, who, if he saw them, paid no attention to either. These life rings were kept in brackets on either side of the forward end of the cockpit. After Rhoda threw the rings he went forward along the catwalk of the Cappy to get the boat hook and started back with it to reach for Dickie, but when the cruiser came within twenty or twenty-five feet of him, Dickie disappeared.

██ We are bound by finding 3 that appellant and his guests had five or six drinks of liquor within a period of four or five hours before the accident, but we are not bound by finding 7 that appellant was incapable of co-ordination due to the use of liquor, coupled with his physical impairment, at the time of the accident. There is of course a presumption that intoxicating liquor if used to excess, will affect a person both mentally and physically, but there is no evidence that appellant's judgment was so affected at the time Dickie went overboard. The undisputed evidence is that at that time appellant was steering the cruiser at about seven or eight miles an hour because of the roll of the lake. Moreover, there is no finding that appellant's drinking, or physical condition, contributed in the least to the unsuccessful effort to rescue Dickie.

As indicated above, the court found that appellant was negligent in failing to turn his boat about instead of backing it astern. There was conflicting evidence on this point. One expert witness testified that it would have been proper to back the cruiser in an effort to save Dickie. To the contrary, Capt. Gould, a retired merchant marine inspector, testified that he would have turned the Cappy around and ordinarily we would be compelled to accept the court's finding as true, but Capt. Gould put his finger on the critical point when he said that in case of a tragedy or accident at

sea a capable steersman will do the first thing that he thinks will help or do the most good.

■■ We are dealing with a "tragedy", —an emergency. The cry, "Man Overboard", the excitement incident thereto, the fact that appellant had to act immediately if at all, the uncertainty, in the absence of opportunity for mature consideration, that any action would be effective; these, and all the other facts and circumstances taken together, must be considered in determining whether appellant was negligent in backing the cruiser. See Union Pac. R. Co. v. McDonald, 152 U.S. 262, 281, 14 S. Ct. 619, 38 L.Ed. 434; Horton Motor Lines v. Currie, 4 Cir., 92 F.2d 164, 167. We think that if appellant erred at all in backing instead of turning the cruiser, the error was one of judgment and not of negligence. Further, we think an unsurmountable objection to the judgment in appellee's favor is the entire lack of evidence that anything appellant did or left undone caused his efforts at rescue to fail. It does not appear that if appellant had turned the cruiser instead of backing it, Dickie would or should have been saved. Ford v. Trident Fisheries Co., 232 Mass. 400, 402, 122 N.E. 389.

The court found that appellee sustained damages as a direct result of the negligence of appellant, but it points to no specific act or acts of negligence that brought about that result. In its oral opinion, the court states that appellant should have made a better and more reasonable effort to rescue Dickie. The opinion further states, "I do not say that he necessarily could or should have succeeded in doing so. * * *" However, the court found that appellant failed to make a reasonable effort to rescue decedent. The court did not point out what it had in mind by the term "reasonable effort" and the record does not disclose any particular thing or things that appellant did or failed to do which proximately caused the death of Dickie.

■■ We think that the decree in favor of appellee has no substantial support in the evidence, and as pointed out in Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 334, 53 S.Ct. 391, 77 L.Ed. 819, rests upon mere speculation and conjecture. We recognize the correctness of the rule that we should accord due weight to the findings and judgment of the court, but we are not bound to accept them. Kellogg S. S. Corp. v. Belcher Oil Co., 5 Cir., 126 F. 2d 18, 19. We are required to examine the record and determine for ourselves whether it fairly supports the findings. This we have done, minutely; and our conclusion is that there is no evidence to support either the findings in the matter above indicated or the decree. Appellee's action is predicated upon the Ohio Death Statute or "Action For Wrongful Death" [Sec. 10509-166; Feige v. Hurley, 6 Cir., 89 F.2d 575], under which the defense of contributory negligence of decedent is available, but we need not consider testimony to that effect because, as stated, we have found no actionable negligence on the part of appellant.

The judgment is reversed and the case dismissed.